Submitted on record and briefs April 10, affirmed June 21, 1995

# JASON DAVID OSBORN,
*Petitioner,*

*v.*

# PSYCHIATRIC SECURITY REVIEW BOARD,
*Respondent.*

## (89-1033; CA A85362)

898 P2d 789

Harris S. Matarazzo filed the brief for petitioner.

Theodore R. Kulongoski, Attorney General, Virginia L. Linder, Solicitor General, and Pamela G. Wood, Assistant Attorney General, filed the brief for respondent.

Before Riggs, Presiding Judge, and Edmonds and Leeson, Judges.

EDMONDS, J.

## EDMONDS, J.

Petitioner seeks review of an order of the Psychiatric Security Review Board (PSRB) denying his request for discharge and ordering his continued commitment. ORS 161.346(1). We affirm.

Petitioner was found guilty except for insanity of sodomy in the first degree and sexual abuse in the first degree. At the time of that adjudication on July 9, 1989, petitioner had been diagnosed by a medical doctor as suffering from an organic personality syndrome and borderline intellectual functioning (borderline IQ). Regarding petitioner's organic personality syndrome, the physician said:

"This disorder is a major mental disorder based upon organic impairment and should not be confused with the functional personality disorders. It is more akin to brain damage secondary to causes such as strokes or dementia, with which it is placed in the definitions of the Diagnostic and Statistical Manual of Mental Disorders III-R.

"Because of this disorder [petitioner] is substantially impaired in his ability to understand the quality of his acts, and because of that to conform those acts to the requirements of law."

As a result of that diagnosis, petitioner was placed under the jurisdiction of PSRB. On July 13, 1989, petitioner's treating doctor at Oregon State Hospital included pedophilia as part of his diagnosis of petitioner's condition. According to the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (3d ed 1987) (DSM-III-R), pedophilia is a mental disorder with the following criteria:

"A. Over a period of at least six months, [the person has] recurrent intense sexual urges and sexually arousing fantasies involving sexual activity with a prepubescent child or children (generally age 13 or younger).

"B. The person has acted on these urges, or is markedly distressed by them.

"C. The person is at least 16 years old and at least 5 years older than the child or children in A." DSM-III-R at 285.

Since 1989, petitioner has remained under the jurisdiction of PSRB, and pedophilia has been a consistent part of

his diagnosed condition. The record also indicates that he has been accused by other patients of acting inappropriately in a sexual manner, and that he has refused to participate in the hospital treatment programs, including the sex offender treatment program. Petitioner's doctors have maintained that such treatment is a necessary step before he could be conditionally released or discharged.

In 1993, petitioner requested a hearing pursuant to ORS 161.341, seeking a discharge from PSRB's jurisdiction. In a "progress note update" completed before the hearing, petitioner's current treating doctor, Meyer, made the following assessment of his condition:

"In our opinion, [petitioner] still cannot be safely managed in the community. He has been institutionalized most of his life. He remains uncooperative and noncompliant to treatment. He still is frequently accused of inappropriate sexual advances towards other patients. These advances sometimes result in altercations. For instance, the other day he reportedly grabbed another patient in the crotch. This patient swung his fist and hit [petitioner] in the face, causing a laceration above his left eyebrow.

"[Petitioner] continues to deny any sexual misbehavior or sexual problems. He refuses to attend treatment team meetings, he refuses to participate in the majority of treatments offered him, he occasionally participates in activity therapy, and he will not talk with his psychiatrist one-on-one, with his case monitor, or with other staff. He continually says, 'I don't like you,' 'I don't belong here,' 'I don't have any problems,' and 'You should get me out.'

"On the other hand, [petitioner] shows very little desire to leave the hospital. He shows very little discomfort about being here and seems to enjoy picking at others, making fun of them, and making sarcastic comments. It is difficult to make progress on [petitioner] considering his present attitude. We will continue to try to involve him in treatment and eventual transfer to the Sex Offender Treatment Program."

Meyer diagnosed petitioner's condition at that time as pedophilia, borderline IQ and mixed personality disorder. Meyer did not include an organic personality disorder in the diagnosis. At the hearing, Meyer testified to petitioner's current condition, stating that petitioner

"[has] always gotten into difficulties with sexual acting out, act[s] sexually inappropriate with other patients, get[s] into conflicts as a result of his sexual behavior * * * lack[s] * * * cooperativeness to treatment * * *."

Meyer also testified that if petitioner was unsupervised in the community, he would likely act out sexually against children again, but that he would do so of his own free will and would be able to understand the wrongfulness of such conduct.

After the hearing, PSRB found, in part:

"2. [Petitioner] is affected by a mental disease or defect as demonstrated by the underlying facts shown by the evidence including the expert testimony of John Meyer, M.D., at the hearing to the effect that [petitioner] suffers from a diagnosis of pedophilia as well as borderline or low average IQ."

Petitioner makes four assignments of error. He argues first that PSRB lacked substantial evidence to find that he suffers from a "mental disease or defect"; second, that under ORS 161.295(2) and OAR 859-10-005(4), his condition is excluded from the definition of a "mental disease or defect"; third, that PSRB erred as a matter of law in continuing his commitment, because he no longer suffers from the condition responsible for his placement under PSRB's jurisdiction; and fourth, that PSRB unlawfully delegated its authority when it adopted OAR 859-10-005. We first address petitioner's third assignment of error.

Petitioner argues that PSRB has no authority to retain jurisdiction over him under ORS 161.341(4)(a), because he no longer suffers from the mental disease or defect that resulted in his adjudication of guilty except for insanity. Petitioner relies on our holding in *Baldwin v. PSRB*, 97 Or App 367, 776 P2d 577 (1989), in which we said that

"the legislature clearly intended that, before being discharged under ORS 161.341(4)(a), a person must no longer be affected by the condition that made her dangerous, that is, the mental disease or defect *that originally caused her to be placed under PSRB's jurisdiction." Id.* at 371. (Emphasis in original.)

However, our statement must be considered in the light of the facts of that case. In *Baldwin*, the petitioner argued that

because she had been found to have a mental disease or defect as a result of a personality disorder, and that after that determination the legislature had amended ORS 161.295(2) to exclude personality disorders from being classified as "mental diseases or defects," she was no longer under PSRB's jurisdiction. We held that, because at the time of petitioner's initial adjudication her personality disorder was considered to be a mental disease or defect, the legislature could not have intended to withdraw PSRB's jurisdiction over persons within its jurisdiction before the amendment was enacted. *Id.* at 370-71. Thus, our statement in *Baldwin* was in the context of the facts of that case and does not necessarily require that PSRB must discharge a person when he or she is no longer suffering from the same mental disease or defect that resulted in the initial adjudication.[1]

We turn to the language of the pertinent statutes to analyze whether the legislature intended PSRB to have the authority to retain a committed person under its jurisdiction when he or she suffers from a mental disease or defect other than the one that resulted in PSRB's jurisdiction. The statutes creating and governing PSRB are found in ORS 161.290 *et seq.* ORS 161.295 provides, in part:

> "(1) A person is guilty except for insanity if, as a result of mental disease or defect at the time of engaging in criminal conduct, the person lacks substantial capacity either to appreciate the criminality of the conduct or to conform the conduct to the requirements of the law."

Under ORS 161.319 and ORS 161.325, the trial court enters a judgment when a defendant is found guilty except for insanity. After the entry of such a judgment, the trial court proceeds to make certain required findings under ORS 161.325 and considers whether to place the person under the jurisdiction of PSRB and to commit the person to a state mental hospital, or to order a conditional release or discharge. ORS 161.329 authorizes the trial court to discharge the person from custody:

---

[1] Petitioner's reliance on *Strecker v. PSRB*, 116 Or App 553, 842 P2d 435 (1992), *on recons* 120 Or App 178, 851 P2d 1151 (1993), is similarly misplaced, because, like *Baldwin*, it does not address whether PSRB is required to retain petitioner only if he suffers from the same condition that caused his initial commitment. *See also Martin v. PSRB*, 103 Or App 385, 388, 797 P2d 401, *rev'd* 312 Or 157, 818 P2d 1264 (1991) (quoting the identical language from *Baldwin*).

"Following the entry of a judgment pursuant to ORS 161.319 and the dispositional determination under ORS 161.325, if the court finds that the person is no longer affected *by mental disease or defect*, or if so affected, no longer presents a substantial danger to others and is not in need of care, supervision or treatment, the court shall order the person discharged from custody." (Emphasis supplied.)

ORS 161.336 and ORS 131.341 provide for similar dispositions in the event that the person is placed under PSRB's jurisdiction. The duration of PSRB's jurisdiction can be no longer than the maximum sentence that the court finds that the person could have received, had the person been found guilty without a finding of insanity. ORS 161.328(3). Under ORS 161.341, PSRB makes an initial finding about whether the person is eligible for discharge. ORS 161.341(4) provides:

"(4)   Any person who has been committed to a state hospital designated by the Mental Health and Developmental Disability Services Division for custody, care and treatment or another person acting on the person's behalf may apply to the board for an order of discharge or conditional release upon the grounds:

"(a)   That the person is no longer affected *by mental disease or defect*;

"(b)   If so affected, that the person no longer presents a substantial danger to others; or

"(c)   That the person continues to be affected *by a mental disease or defect* and would continue to be a danger to others without treatment, but that the person can be adequately controlled and given proper care and treatment if placed on conditional release." (Emphasis supplied.)

If after the initial hearing, a person is retained under the jurisdiction of PSRB, PSRB conducts periodic reviews of the person's psychiatric state and conducts hearings on motions for conditional release or discharge. ORS 161.346 and ORS 161.351 govern those determinations. ORS 161.346(1) provides:

"The board shall conduct hearings upon any application for discharge, conditional release, commitment or modification filed pursuant to ORS 161.336, 161.341 or 161.351 and as otherwise required by ORS 161.336 to 161.351 and shall make findings on the issues before it which may include:

"(a) If the board finds that the person is no longer affected *by mental disease or defect*, or, if so affected, no longer presents a substantial danger to others, the board shall order the person discharged from commitment or from conditional release.

"(b) If the board finds that the person is still affected *by a mental disease or defect* and is a substantial danger to others, but can be controlled adequately if conditionally released with treatment as a condition of release, the board shall order the person conditionally released as provided in ORS 161.336.

"(c) If the board finds that the person has not recovered from *the mental disease or defect* and is a substantial danger to others and cannot adequately be controlled if conditionally released on supervision, the board shall order the person committed to, or retained in, a state hospital designated by the Mental Health and Developmental Disability Services Division for care, custody and treatment." (Emphasis supplied.)

PSRB argues that the emphasized phrases in ORS 161.341(4)(a) and ORS 161.346(1) indicate that the legislature intended that PSRB retain authority if the person continues to suffer from *any* mental disease or defect. However, the language in ORS 161.346(1)(c), which requires the court to retain jurisdiction if the person "has not recovered from *the* mental disease or defect" is inconsistent with that argument. That language suggests that there is a specific mental disease or defect from which the person must recover in order to be discharged, *i.e.*, the mental disease or defect that caused the commitment. PSRB counters that argument by arguing,

"the three subsections of ORS 161.346(1) are intended to be read in sequence, and use of the phrase 'the mental disease or defect' in the final section constitutes merely a reference to the previous phrases, 'no mental disease or defect,' found in ORS 161.346(1)(a), and 'a mental disease or defect,' found in ORS 161.346(1)(b)."

PSRB's interpretation of the statute is a plausible reading. Furthermore, it is clear that the legislature did not contemplate a discharge so long as the person remained a "substantial danger to others." On the other hand, it is apparent that the legislature did not intend for a person to continue to be deprived of his or her liberty in the absence of a

mental disease or defect. It has provided a vehicle for discharge at each step of the process. Significantly, a person could be discharged immediately after being adjudicated guilty except for insanity. We conclude that the text and context of the statutes do not eliminate doubt about what the legislature intended when a person suffers from a mental disease or defect other than the one that existed at the time of trial. We turn to the legislative history underlying the statutory scheme.

Chapter 743 of the 1971 Oregon Laws, on which the current statutes on criminal responsibility are based, originated from Article 5 of the Criminal Law Revision Commission, Proposed Oregon Criminal Code, Final Draft and Report (July 1970). Article 5 proposed a revision of Oregon law on the use of the insanity defense and on the requirements for commitment to the Oregon State Hospital after a successful defense. It also suggested a codification of some of the existing common law rules regarding when an "insane" person should be retained in custody and when he or she should be discharged.[2] The language in the proposal is instructive:

> **"Section 48. Hearings on applications; orders of court.** (1) The court shall conduct a hearing upon any application for discharge, release or supervision or modification filed pursuant to section 46 or 47 of this Act. If the court finds that the person is no longer suffering *from mental disease or defect*, or, if so affected, that he no longer presents a substantial danger to himself or the person of others, the court shall order him discharged from custody or from supervision. If the court finds that the person is still affected by *a mental disease or defect* and is a substantial danger to himself or to the person of others, but can be controlled adequately if he is released on supervision the court shall order him released on supervision as provided in section 46 of this Act. If the court finds that the person has not recovered from *his mental disease or defect* and is a substantial danger to himself or the person of others and cannot adequately be controlled if he is released on supervision, the court shall

---

[2] In 1971, new revisions were proposed, which recommended the creation of PSRB as the administrative body that would be given authority over a person once a trial court found the person "guilty except for insanity" and also found that the person was still affected by mental disease or defect. These new revisions did not alter the 1970 proposed requirements for discharge.

order him remanded for continued care and treatment."
(Emphasis supplied.)

In its commentary, the commission explained:

"The standard for release set up in this subsection affects
[*sic*] a change in the present Oregon law. ORS 136.730 was
recently construed in *Newton v. Brooks*, 246 Or 484[, 426
P2d 446] (1967), where the court laid down the requirements
that before a person in confinement following commitment
after a not guilty by reason of insanity verdict is entitled to
discharge, he must prove by a preponderance of evidence
(1) that he has the mental capacity to understand the differ-
ence between right and wrong, *and* (2) that with reasonable
probability he will control his behavior so that his liberty will
not be a danger to the public.

"This subsection * * * changes the focus somewhat,
although it achieves what is believed to be the goal of the
holding in *Newton v. Brooks.* Thus, a person committed to
the Oregon State Hospital following a successful defense of
insanity under this subsection is entitled to release if he has
'recovered' from his mental disease or defect (*i.e.*, is sane
within the definition of § 36) which is in accord with the first
part of the rule in *Newton v. Brooks.* Under the subsection
even if the person in custody cannot prove he is sane within
the definition of § 36, if he can show he no longer presents a
substantial danger to himself or the person of others, he is
entitled to discharge. This is a variation from *Newton* which
requires the defendant to prove his sanity *and* that he is no
longer a danger to the public." (Emphasis in original.)

In *Newton*, the superintendent of the Oregon State
Hospital appealed a *habeas corpus* order discharging from
custody a person, Kealey, who had been committed under
*former* ORS 136.730 following an acquittal of criminal
charges on the ground of "insanity." After Kealey had been at
the hospital for three months, his mother initiated the *habeas
corpus* proceeding. Kealey's doctors testified that, although
he was not grossly psychotic at that time, Kealey was dan-
gerous. The trial court ruled that whether Kealey was dan-
gerous was irrelevant, and that, so long as he was "sane," he
was entitled to release. The Supreme Court reversed, holding
that Kealey was not entitled to discharge from custody with-
out a judicial finding that he was no longer dangerous. It said:

"If a mental disorder makes the person's freedom a
hazard to society, public safety may require his detention.

This is a reasonable legislative objective.

> "So long as a person's mental disorder continues, *whatever form the disorder may take, or whatever name the doctors may give it,* if it is probable that the disorder would make the person's liberty dangerous to the public, the legislative policy within constitutional bounds ought to be carried out." 246 Or at 489-90. (Emphasis supplied.)

Dr. J. D. Bray, Administrator of the Mental Health Division, made a similar point in his testimony regarding the proposed revisions:

> "The person's mental condition may change from time to time requiring changes in the type of care, treatment, or custody required." House Judiciary Committee, HB 2382, April 13, 1971, Ex A.

Another witness explained the primary goals of the revisions. He testified that two of those goals were that the criteria for commitment should be more clearly defined and should clearly relate to the committed person's dangerousness in the community, and that the use of PSRB to make these determinations would lead to more appropriate decisions in that regard. Tape recording, House Judiciary Committee, April 13, 1971, Side I at 57-59. Taken together, these excerpts of legislative history indicate that a primary concern of the drafters of Chapter 743 was the danger that a mentally ill person could pose to the community. Nonetheless, we can find no explicit indication in the legislative history that the legislature ever considered the specific problem presented by the facts of this case.

■      When legislative history is not dispositive, we resort to aids to construction, one of which is to determine what the legislature would have done, had it contemplated the issue. *Marks v. McKenzie High School Fact-Finding Team*, 319 Or 451, 457, 878 P2d 417 (1994). We conclude that, in the light of the primary goal of the statutes not to release persons who would endanger the public, the legislature intended PSRB to retain jurisdiction over an individual who continues to suffer from any mental disease or defect that causes the person to be a substantial danger to others, regardless of whether it is the same disease or defect that resulted in the adjudication under ORS 161.295.

■ Petitioner also argues that PSRB erroneously relied on its administrative rules in defining "mental disease or defect." He contends that PSRB's rules defining "mental disease" and "mental defect" are unlawful, because PSRB has improperly delegated its authority to the American Psychiatric Association, a non-public source, by adopting the "current [DSM]" definition.

The legislature has not defined "mental disease or defect" other than to specifically exclude from their definition

"an abnormality manifested only by repeated criminal or otherwise antisocial conduct, * * * [or] any abnormality constituting solely a personality disorder." ORS 161.295.

On the other hand, PSRB has defined "mental disease or defect" by rule. OAR 859-10-005(4) says a "mental disease" is

"any diagnosis of mental disorder which is a significant behavioral or psychological syndrome or pattern that is associated with distress or disability causing impairment in at least one important area of an individual's functioning and is defined in *the current Diagnostic and Statistical Manual of Mental Disorders (DSM) of the American Psychiatric Association.*" (Emphasis supplied.)

OAR 859-10-005(5) defines "mental defect" as

"mental retardation, brain damage or other biological dysfunction that is associated with distress or disability causing symptoms or impairment in at least one important area of an individual's functioning and is defined in *the current Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association.*" (Emphasis supplied.)

Petitioner argues that the language "current [DSM]" used in OAR 859-10-005(4) and (5) should be interpreted as meaning whatever edition of DSM is the latest edition at the time of the hearing, and it follows that PSRB could not lawfully adopt the subsequent changes of the privately compiled manual without a hearing or some further consideration.[3] He relies on *Hillman v. North Wasco PUD*, 213 Or 264, 323 P2d 664 (1958), *overruled on other grounds*

---

[3] Petitioner does not otherwise challenge the validity of those rules or contend that they exceed the authority granted to PSRB by the legislature.

by *Maulding v. Clackamas County*, 278 Or 359, 563 P2d 731 (1977), in support of his argument.

In *Hillman*, the Public Service Commission adopted the "latest edition" of the National Electric Code, a code compiled by a private organization, as its safety standards. The court held that the commission's adoption of the subsequent changes in the code, without a hearing or further consideration, was an improper exercise of the agency's administrative discretion. *Id.* at 284. However, the court also opined that it would be within the agency's discretion to adopt a particular edition of the code as the agency standard. *Id.*

Petitioner correctly asserts that if PSRB intended the emphasized phrase to include all subsequent editions of DSM, then PSRB has improperly exercised its authority. However, PSRB argues that the word "current" in the rule means the edition that was in effect at the time of the adoption of the rule. We conclude that PSRB's interpretation of the language in OAR 859-10-005(5) and (6) is a plausible one and it is not inconsistent with the wording of the rule itself, the rule's context, or with any other source of law. Therefore, we defer to the agency's interpretation of its own rule. *Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 881 P2d 119 (1994). Accordingly, we reject petitioner's argument.

We turn to petitioner's other assignments of error. Preliminarily, we note that we will consider petitioner's arguments to be preserved for review only if he specifically made them to PSRB. Otherwise, the exercise of the discretionary functions of PSRB are frustrated by the inability to consider what has not been presented to it. *Cramer v. PSRB*, 122 Or App 290, 291, 857 P2d 232 (1993). Petitioner's first two assignments of error appear to be somewhat broader than the arguments that were made to PSRB. To PSRB, he argued that, because he was no longer suffering from the same mental disease or defect that originally resulted in his commitment, he was entitled to be discharged. He did not argue that the diagnostic criteria under DSM-III-R for pedophilia were not satisfied. Before us, he argues that there is not substantial evidence to support PSRB's findings that he

suffers from a mental disease or defect.[4] We consider his assignment of error in the light of what he argued to PSRB. As we have already held, it is not necessary for PSRB to find that he presently suffers from the same mental disease from which he suffered at the time of his adjudication to continue its jurisdiction.

**3.** Second, he argues that "pedophilia" as defined by the diagnostic criteria from DSM-III-R does not meet the legal definition of a "mental disease." He asserts:

> "[PSRB] erred, in determining that petitioner suffers from a 'mental disease or defect' by finding as a matter of law that 'pedophilia' and '[borderline IQ]' constitute a 'mental disease or defect.'
>
> "* * * * *
>
> "Although 'mental disease or defect' is not specifically defined by statute, the Legislature did provide some exclusions. ORS 161.295(2) states:
>
>> " 'As used in Chapter 743, Oregon Laws 1971, the terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct, nor do they include any abnormality constituting solely a personality disorder.'
>
> "As a result of the exclusions noted above, it is apparent that willful misconduct is not to be included within the definition of 'mental disease or defect.' These exclusions indicate the Legislature's intent that persons engaged in voluntary, willful misconduct, without other underlying psychiatric disorders, should be held responsible for their criminal acts.
>
> "* * * * *
>
> "[Meyer] testified that Petitioner's 'pedophilia' diagnosis was one manifested by repeated 'socially unacceptable' or antisocial conduct, and that Petitioner's participation in pedophilic behavior was knowing and voluntary. As such, pursuant to ORS 161.295(2), * * * Petitioner's 'condition' cannot constitute a 'mental disease or defect' sufficient for [PSRB] to establish its jurisdiction.
>
> "* * * * *

---

[4] In *Osborn v. PSRB*, 119 Or App 430, 851 P2d 614 (1993), we held that there was substantial evidence to support PSRB's "implicit" finding that petitioner's "abnormality is more than one constituting solely a personality disorder." *Id*. at 435.

"Although Dr. Meyer's testimony was specific to Petitioner, as noted above, the criteria set forth in [DSM-III-R] is consistent with his testimony that Petitioner's 'pedophilia' was a condition manifested by antisocial conduct. * * * Unlike a true mental illness, such as 'Schizophrenia' or 'Bipolar Disorder,' 'Pedophilia' does not involve delusions, hallucinations, incoherence, grossly disorganized behavior or mood disturbance. In addition, unlike most conditions constituting a 'mental defect,' 'Pedophilia' is not classified as involving an organic abnormality. Instead, this diagnosis is given to individuals who 'act' upon or are 'markedly distressed by' urges to engage in sexual activity with children. Society, through the Legislature, has deemed this conduct to be illegal. However, this described behavior does not constitute a 'mental disease or defect.' "[5]

We disagree with petitioner's argument. ORS 161.295(1) excludes from the definition of "mental disease or defect" an abnormality that manifests itself "only" through criminal or antisocial conduct. A diagnosis of "pedophilia" as a sexual disorder under DSM-III-R requires more than a manifestation of criminal or antisocial conduct. It also requires "recurrent intense sexual urges and sexually arousing fantasies" over a period of at least six months involving a prepubescent child generally under the age of 13. The diagnosis does not require that the person have acted on the urges. Thus, a person could be diagnosed under the applicable criteria if the person has become "markedly distressed" over the recurrent urges and fantasies. Accordingly, the diagnosis does not depend only on antisocial conduct, and petitioner is wrong when he argues that his diagnosed condition is not a mental disease under ORS 161.295(2) as a matter of law.

Affirmed.

---

[5] Because the language of OAR 859-10-005(4) is nearly identical to that found in ORS 161.295(1), we need not make a separate analysis regarding the definition of "mental disease or defect" in the rule.