Argued and submitted November 5, 1996, decision of the Court of Appeals reversed; order of the Psychiatric Security Review Board vacated, and case remanded to the Board for reconsideration March 27, 1997

JASON DAVID OSBORN,
*Petitioner on Review,*

*v.*

PSYCHIATRIC SECURITY REVIEW BOARD,
*Respondent on Review.*

(PSRB 89-1033; CA A85362; SC S42976)

934 P2d 391

Harris S. Matarazzo, Portland, argued the cause and filed the petition for petitioner on review.

Katharine H. Waldo, Assistant Attorney General, Salem, argued the cause for respondent on review. With her on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Fadeley, Graber, and Durham, Justices.

GRABER, J.

## GRABER, J.

A trial court placed petitioner under the jurisdiction of the Psychiatric Security Review Board (PSRB) in 1989. After a hearing in June 1994, the PSRB denied petitioner's request for discharge and ordered his continued commitment. The PSRB concluded that petitioner continued to suffer from a mental disease or defect, that he continued to present a substantial danger to others, and that the PSRB therefore retained jurisdiction over him. The Court of Appeals affirmed. *Osborn v. PSRB*, 135 Or App 94, 96, 898 P2d 789 (1995). We reverse the decision of the Court of Appeals, vacate the PSRB's order, and remand the case to the PSRB for reconsideration.

On July 10, 1989, after a trial based on stipulated facts, petitioner was found guilty except for insanity, ORS 161.295,[1] of first-degree sodomy and first-degree sexual abuse of a 10-year-old boy. The trial court placed petitioner under the jurisdiction of the PSRB and committed him to Oregon State Hospital (OSH) for a period not to exceed 25 years.

In reaching its decision, the trial court expressly considered a report by a medical doctor who had evaluated petitioner on June 24, 1989, and had diagnosed him as suffering from an organic personality disorder and borderline intellectual functioning. That report stated:

"[Petitioner] has a[n] organic personality disorder, severe, manifest by emotional instability, outbursts of rage and aggression which are out of proportion to any stimulus, markedly inappropriate social judgment including sexual indiscretions, and paranoid and suspicious ideation toward others which is ongoing.

---

[1] ORS 161.295 provides:

"(1) A person is guilty except for insanity if, as a result of mental disease or defect at the time of engaging in criminal conduct, the person lacks substantial capacity either to appreciate the criminality of the conduct or to conform the conduct to the requirements of law.

"(2) As used in chapter 743, Oregon Laws 1971, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct, nor do they include any abnormality constituting solely a personality disorder."

"*  *  *  *  *

"This disorder is a major mental disorder based upon organic impairment and should not be confused with the functional personality disorders. It is more akin to brain damage secondary to causes such as strokes or dementia, with which it is placed in the definitions of the Diagnostic and Statistical Manual of Mental Disorders [(DSM)] III-R."[2]

After petitioner arrived at OSH, another medical doctor, Dr. Meyer, evaluated him on July 13, 1989. Meyer's provisional diagnosis was that petitioner suffered from organic personality syndrome, pedophilia, and borderline intellectual functioning, on Axis I; mixed personality disorder, on Axis II; and "positive PPD, by history,"[3] on Axis III.[4]

Meyer and other professionals who later evaluated petitioner consistently noted that petitioner should receive sex offender treatment. However, petitioner refused to participate in such treatment and, for the most part, would not participate in any other treatment programs.

Pursuant to ORS 161.341,[5] petitioner had a hearing

---

[2] The DSM is a publication of the American Psychiatric Association that categorizes mental disorders and identifies the diagnostic criteria for each. The DSM is discussed more fully later in this opinion. 325 Or at 145.

[3] "Positive PPD, by history," indicates that petitioner has a history of testing positive for tuberculosis. Paul D. Cantor, 8 *Traumatic Medicine and Surgery for the Attorney* 190 (1962).

[4] The DSM-III uses a multiaxial evaluation system for classifying disorders. DSM-III at 23. Axis I consists of clinical syndromes and V Codes. For a definition of "V Codes," see note 13, below. Axis II consists of developmental disorders and personality disorders. All mental disorders fall within those two axes. *Ibid.* Axis III is for physical disorders and conditions. Axis IV, Severity of Psychosocial Stressors, and Axis V, Highest Level of Adaptive Functioning Past Year, provide information supplementing the official DSM-III diagnoses (Axes I, II, and III) that may be useful for treatment planning. *Id.* at 8.

[5] ORS 161.341(4) provides:

"Any person who has been committed to a state hospital designated by the Mental Health and Developmental Disability Services Division for custody, care and treatment or another person acting on the person's behalf may apply to the board for an order of discharge or conditional release upon the grounds:

"(a) That the person is no longer affected by mental disease or defect;

"(b) If so affected, that the person no longer presents a substantial danger to others; or

"(c) That the person continues to be affected by a mental disease or defect and would continue to be a danger to others without treatment, but that the person can be adequately controlled and given proper care and treatment if placed on conditional release."

before the PSRB on June 27, 1994,[6] at which he sought discharge from the PSRB's jurisdiction. The burden of proof was on the state. ORS 161.341(5).

In a progress note update three days before the hearing, Meyer wrote that petitioner suffered from pedophilia, on Axis I, and borderline or low average IQ and "mixed personality disorder, primarily passive-aggressive and dependent features," on Axis II. He listed no Axis III diagnosis.

Meyer and petitioner were the only witnesses at the hearing. Meyer testified that petitioner currently had an Axis I diagnosis of pedophilia and explained that petitioner's initial diagnosis of organic personality disorder had been a provisional diagnosis. Meyer stated: "[I]t takes a while to evaluate somebody, especially in [petitioner's] case * * * he's not a particularly reliable historian and we don't really have much [sic] information sources other than himself." Petitioner testified that he previously was a sex offender but is not now one and that other patients made up lies about his sexually acting out on the ward because "they don't like sex offenders."

By order dated July 7, 1994, the PSRB continued its jurisdiction over petitioner. The PSRB found as fact that:

"2. [Petitioner] is affected by a mental disease or defect as demonstrated by the underlying facts shown by the evidence including the expert testimony of John Meyer, M.D., at the hearing to the effect that [petitioner] suffers from a diagnosis of pedophilia as well as borderline or low average IQ. This finding is further supported by the information contained in [particular exhibits].

"* * * * *

"4. The State sustained its burden of proving by a preponderance of the evidence that [petitioner] continues to be affected by a mental disease or defect and continues to be a

---

[6] Petitioner had an earlier hearing before the PSRB on January 6, 1992. The PSRB denied his request for discharge or conditional release at that time, and the Court of Appeals affirmed. *Osborn v. PSRB*, 119 Or App 430, 432, 851 P2d 614 (1993) (*Osborn I*). Petitioner requested the present hearing in November 1993. Because his lawyer obtained three continuances, the hearing was not held until June 27, 1994.

substantial danger to others and that he should not be discharged from the jurisdiction of the [PSRB]."

The PSRB concluded as a matter of law that:

"1. [Petitioner], being affected by a mental disease or defect and presenting a substantial danger to others, is under the jurisdiction of the [PSRB]."

The Court of Appeals affirmed, and we allowed petitioner's petition for review.

## PSRB'S CONTINUING JURISDICTION WHEN A DIAGNOSIS CHANGES

■ In its order denying petitioner's release, the PSRB relied on ORS 161.346(1)(c) for its continued jurisdiction. ORS 161.346(1) provides:

"The board shall conduct hearings upon any application for discharge, conditional release, commitment or modification filed pursuant to ORS 161.336, 161.341 or 161.351 and as otherwise required by ORS 161.336 to 161.351 and shall make findings on the issues before it which may include:

"(a) If the board finds that the person is no longer affected *by mental disease or defect*, or, if so affected, no longer presents a substantial danger to others, the board shall order the person discharged from commitment or from conditional release.

"(b) If the board finds that the person is still affected *by a mental disease or defect* and is a substantial danger to others, but can be controlled adequately if conditionally released with treatment as a condition of release, the board shall order the person conditionally released as provided in ORS 161.336.

"(c) If the board finds that the person has not recovered *from the mental disease or defect* and is a substantial danger to others and cannot adequately be controlled if conditionally released on supervision, the board shall order the person committed to, or retained in, a state hospital designated by the Mental Health and Developmental Disability Services Division for care, custody and treatment." (Emphasis added.)

The parties dispute whether that statute provides a basis for the PSRB to retain jurisdiction over petitioner. Petitioner asserts that, at the time of his PSRB hearing in June 1994, he no longer suffered from an organic personality disorder, the condition for which he initially was placed under the PSRB's jurisdiction. Petitioner argues that, because he has "recovered" from the organic personality disorder, the PSRB could not continue its jurisdiction over him by finding that he now suffers from a *different* condition, even if that condition is a mental disease or defect within the meaning of ORS 161.295.

The PSRB responds that, as long as an individual who is under the PSRB's jurisdiction continues to suffer from *any* mental disease or defect within the meaning of ORS 161.295, the PSRB continues to have jurisdiction over that individual. The PSRB asserts that, although petitioner's diagnosis has changed from organic personality disorder to pedophilia, he still has a mental disease or defect and, therefore, still is subject to the PSRB's jurisdiction.

ORS 161.346(1) contains two requirements that must be met for the PSRB to continue jurisdiction over a person. First, the person must suffer from a mental disease or defect. Second, the person must present a substantial danger to others. The parties do not dispute that petitioner presents a substantial danger to others. Rather, the dispute centers on whether he has a mental disease or defect sufficient to allow the PSRB's continued jurisdiction. Therefore, we will discuss only that first statutory requirement.

In determining the meaning of a statute, we must discern the legislature's intent. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). The first level of analysis is an examination of the text and context of the statute. *Ibid.*

At the outset, we agree with the PSRB that its jurisdiction under ORS 161.346(1) does not, by its terms, depend on a particular "diagnosis"; the statute refers to a condition of having a "mental disease or defect." A diagnosis is merely a label given to a condition; it is not the condition itself. Thus, the label may change, even though the individual's mental condition remains the same. A mere change in the label

placed on a condition does not, in and of itself, mean that an individual has recovered from the mental disease or defect that originally placed him or her under the PSRB's jurisdiction. A variety of factors may account for a change in an individual's diagnosis. For example, the initial diagnosis may have been erroneous, because it was made without sufficient or accurate information about the individual or his or her history; the evolution of new diagnostic criteria may lead to a different diagnosis; or subjective views of the evaluator may influence the diagnosis.

Nonetheless, we must consider whether the "mental disease or defect" found at the time of the hearing must, under the statute, be the same "mental disease or defect" identified at the time of initial placement. Specifically, we are called upon to determine why the legislature used a different modifier or omitted the modifier before the phrase "mental disease or defect" in each of the three paragraphs of ORS 161.346(1). In paragraph (a), there is no modifier. In paragraph (b), the indefinite article "a" is used while, in the paragraph (c), the definite article "the" is used.

When read in the order written, all parts of that statute are clear. That is, the three paragraphs of ORS 161.346-(1) must be read sequentially to understand the logic in using first no modifier and then two different modifiers. By not using a modifier in the first paragraph, the legislature intended that the PSRB discharge any person who no longer suffers from *any* mental disease or defect or who, if affected, is not dangerous. Under paragraph (b), if the PSRB has found under (a) that a person still suffers from *a* mental disease or defect and is dangerous, the board must conditionally release that person if he or she can be controlled adequately. Finally, in paragraph (c), the legislature intended for continued confinement of a person who suffers from *the* mental disease or defect that was identified under paragraph (b) and who is dangerous and cannot safely be released conditionally. A textual analysis thus shows that the legislature intended for the PSRB to continue jurisdiction over a person who suffers from any mental disease or defect, even if the diagnosis has changed.

Context supports the same conclusion. The context of a statute includes other provisions of the same statute and other related statutes. *PGE*, 317 Or at 611. ORS 161.351(1) provides that the PSRB shall discharge any individual under its jurisdiction if it finds "that the person is no longer affected *by mental disease or defect*" or, if affected, does not present a substantial danger to others. (Emphasis added.) *See also* ORS 161.336(7)(a) (a person who is on conditional release may seek discharge from the PSRB's jurisdiction if he or she "is no longer affected *by mental disease or defect*" or, if affected, is no longer a substantial danger to others (emphasis added)); ORS 161.341(4) (any person under the PSRB's jurisdiction may apply for an order of discharge or conditional release if he or she "is no longer affected *by mental disease or defect*" (emphasis added)). The lack of a modifying article in those statutes (just as there is no modifying article in ORS 161.346(1)(a) means that reference to a *specific* mental disease or defect is not contemplated or intended.[7]

In summary, the text and context of ORS 161.346(1) show that the PSRB may continue jurisdiction over a person who is affected by a mental disease or defect, even if the diagnosis at the time of the PSRB hearing differs from the initial diagnosis.

## PSRB'S DEFINITION OF "MENTAL DISEASE OR DEFECT" BY REFERENCE TO THE DSM

Petitioner next argues that the PSRB erred as a matter of law in enacting a rule that defines a mental disease or defect in part by reference to the "current" DSM and in applying the DSM-III-R to his case.

---

[7] The PSRB's rules likewise provide that the PSRB retains jurisdiction over an individual who suffers from *any* mental disease or defect as defined in the applicable statute. For example, OAR 859-60-025 provides that, when a person requests conditional release, the PSRB must consider whether he or she can be adequately controlled in the community, "although still affected *by mental disease or defect*" (emphasis added). In addition, OAR 859-60-030 provides that, when an individual applies for discharge, the PSRB shall determine whether the person "continues to be affected *by a mental disease or defect*" and shall discharge the individual if he or she "is no longer affected *by mental disease or defect*" (emphasis added). The absence of the definite article "the" in the rules suggests that, in the PSRB's view, its continued jurisdiction does not depend on the presence of a *particular* mental disease or defect.

The legislature has not defined the phrase "mental disease or defect" directly, other than to exclude from the definition "an abnormality manifested only by repeated criminal or otherwise antisocial conduct * * * [or] any abnormality constituting solely a personality disorder." ORS 161.295(2). *See also* ORS 161.295(1) (describing conditions for verdict of "guilty except for insanity"). Pursuant to ORS 161.387(1),[8] the PSRB in 1985 adopted rules in which it incorporated those statutory exclusions, OAR 859-10-005(4) (1987),[9] and defined the terms "mental disease" and "mental defect," OAR 859-10-005(5) and (6) (1987). Before a 1995 amendment,[10] those terms were defined as follows:

"(5) 'Mental Disease'. Mental disease is defined as any diagnosis of mental disorder which is a significant behavorial [*sic*] or psychological syndrome or pattern that is associated with distress or disability casuing [*sic*] symptoms or impairment in at least one important area of an individual's functioning and is *defined in the current Diagnostic and Statistical Manual of Mental Disorders (DSM) of the American Psychiatric Association.*

"(6) 'Mental Defect'. Mental defect is defined as mental retardation, brain damage or other biological dysfunction that is associated with distress or disability causing symptoms or impairment in at least one important area of an

---

[8] ORS 161.387(1) provides:

"The Psychiatric Security Review Board * * * may implement its policies and set out its procedure and practice requirements and may promulgate such interpretive rules as the board deems necessary or appropriate to carry out its statutory responsibilities."

[9] OAR 859-10-005(4) (1987) provided:

" 'Mental Disease or Defect.' The Board shall not discharge a person whose mental disease or defect may, with reasonable medical probability, occasionally become active, and when active, render the person a danger to others:

"(a) The term 'mental disease or defect' does not include an abnormality manifested solely by repeated or [*sic*] criminal or otherwise antisocial conduct.

"(b) For offenses committed on or after January 1, 1984, the term 'mental disease or defect' does not include any abnormality constituting solely a personality disorder."

[10] The PSRB amended OAR 859-10-005(5) and (6) in 1995 to refer to the DSM-IV and renumbered those provisions as OAR 859-10-005(4) and (5). The PSRB also amended portions of OAR 859-10-005 in 1987, but it did not amend subsections (4), (5), or (6) at that time.

individual's functioning and is *defined in the current Diag-
nostic and Statistical Manual of Mental Disorders of the
American Psychiatric Association.*" OAR 859-10-005 (1987)
(emphasis added).

The DSM is a publication of the American Psych-
iatric Association that compiles a list of mental disorders and
sets forth the diagnostic criteria for each one. It provides
clinicians and research investigators with "a common lan-
guage with which to communicate about the disorders for
which they have professional responsibility." DSM-III at 1.

The American Psychiatric Association has published
five editions of the DSM. The DSM-III was published in 1980.
It was revised and republished as the DSM-III-R in 1987.
Both the PSRB and the Court of Appeals applied the DSM-
III-R in petitioner's case.

Petitioner's arguments require that we determine
what the reference to the "current" DSM in OAR 859-10-
005(5) and (6) (1987) means and whether the PSRB improp-
erly delegated its authority to the American Psychiatric
Association by defining mental disease and mental defect in
part by reference to the DSM. Petitioner argues that the
PSRB should have referred to the DSM-III, rather than the
DSM-III-R, because the DSM-III was the "current" edition in
effect in 1985 when OAR 859-10-005 was adopted. He asserts
that he would be entitled to be discharged had the PSRB
applied the DSM-III. In the alternative, petitioner argues
that the rule is not valid if "current" means the latest edition
of the DSM in effect at the time of the hearing. Relying on
*Hillman v. North. Wasco Co. PUD*, 213 Or 264, 323 P2d 664
(1958), *overruled on other grounds by Maulding v. Clacka-
mas County*, 278 Or 359, 365, 563 P2d 731 (1977), petitioner
argues that the PSRB could not lawfully adopt subsequent
changes to a privately compiled manual without holding a
new hearing.

In interpreting a statute or regulation, we must
ascertain the intent of the body that promulgated it. *Perlen-
fein and Perlenfein*, 316 Or 16, 20, 848 P2d 604 (1993). We
look first to the text and context of OAR 859-10-005(5) and (6)
(1987) to determine what the PSRB meant by "current" in the

present case. *See ibid.* (explaining method of analysis); *PGE*, 317 Or at 610 (same).

The text of the rule does not state expressly which edition is the "current" edition of the DSM. The usual definition of "current" is:

> "[1]c(1): presently elapsing * * * (2): occurring in or belonging to the present time: in evidence or in operation at the time actually elapsing * * * (3) *of a serial publication*: most recent * * * 3a: in general knowledge, acceptance, use, or practice: PREVALENT, ACCUSTOMED, GENERAL: commonly accepted, engaged in, followed, used, or practiced: in vogue : CONTEMPORARY." *Webster's Third New Int'l Dictionary* 557 (unabridged ed 1993) (emphasis in original).

That definition suggests that the "current" DSM is the edition that was in effect at the time the PSRB adopted the rule but, without more, it does not clearly resolve the issue.

Context, however, does make clear that meaning. Context includes existing rules of substantive law that are relevant to the statute being interpreted. *Owens v. Maass*, 323 Or 430, 438, 918 P2d 808 (1996). There is such a rule that is relevant here.

In 1958, this court held that an agency may adopt a "particular edition" of another body's code or other set of standards but may not adopt, prospectively, subsequent changes to that code. *Hillman*, 213 Or at 284. Specifically, in *Hillman*, this court held that a state agency's adoption of a national electrical safety code and subsequent changes therein violated the constitutional prohibition against the delegation of legislative powers. *Ibid.* The legislature had given the Public Service Commission (PSC) the authority to regulate the construction, maintenance, and operation of power lines in Oregon. In turn, the PSC had adopted certain portions of the National Electrical Safety Code " 'together with any subsequent changes, modifications, or alterations in such code which may hereafter be issued or adopted by the Bureau of Standards of the Department of Commerce.' " *Id.* at 282-83 (quoting PSC order No. 922). This court held that the PSC did not have "the right to adopt prospectively without hearing or

further consideration subsequent changes, modifications or alterations in such code." *Id.* at 284.

When the PSRB referred to the "current" DSM in OAR 859-10-005(5) and (6) (1987), it did so in the context of the rule of law announced in *Hillman.* The text and context make clear that the "current" DSM in that rule means the DSM-III.

We conclude that the PSRB did not unlawfully delegate its power to the American Psychiatric Association when it adopted a rule defining a mental disease or defect in part by reference to the "current" DSM. The "current" DSM under OAR 859-10-005(5) and (6) (1987) is the DSM-III, because that is the edition that was in effect at the time that the PSRB adopted the rule.

## PEDOPHILIA AS A "MENTAL DISEASE OR DEFECT"

■ Petitioner's third argument is that pedophilia cannot constitute a mental disease or defect sufficient for PSRB jurisdiction, because it falls within the ORS 161.295(2) exclusion for abnormalities "manifested only by repeated criminal or otherwise antisocial conduct." We disagree.

ORS 161.295(2) provides, in part:

"[T]he terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct, nor do they include any abnormality constituting solely a personality disorder."

Similarly, the PSRB's rules exclude from the definition of "mental disease or defect" "an abnormality manifested solely by repeated or [sic] criminal or otherwise antisocial conduct" or "any abnormality constituting solely a personality disorder." OAR 859-10-005(4) (1987).[11]

---

[11] Petitioner does not assert before this court that pedophilia is a personality disorder that falls within the personality disorder exclusion in ORS 161.295(2) and OAR 859-10-005(4)(b) (1987). Petitioner made that argument at his 1992 PSRB hearing, at which he also was denied discharge. On judicial review of that decision, the Court of Appeals determined that pedophilia is not excluded from the definition of mental disease or defect as an "abnormality constituting solely a personality disorder." *Osborn I,* 119 Or App at 435. We do not reach that issue, because it is not presented to us for review.

To support his position that pedophilia falls within the "criminal or otherwise antisocial conduct" exclusion of ORS 161.295(2) and OAR 859-10-005(4)(a) (1987), petitioner cites Meyer's testimony during the PSRB hearing that petitioner's diagnosis of pedophilia is manifested by "socially unacceptable behavior"[12] and that, if petitioner were to engage in pedophiliac activity, it would be knowing and voluntary.

In determining whether pedophilia is a mental disease or defect or whether it fits under the exclusion in ORS 161.295(2), we must ascertain the legislature's intent. We begin by looking at the text and context of the statute. *PGE*, 317 Or at 610.

The text of the statute requires that the abnormality be "manifested *only* by repeated criminal or otherwise antisocial conduct" to be excluded from the definition of mental disease or defect (emphasis added). Words of common usage typically are given their ordinary meaning. *PGE*, 317 Or at 611. The verb to "manifest" means, as relevant, "to show plainly: make palpably evident or certain by showing or displaying." *Webster's* at 1375. "Only" means, as relevant, "exclusively, solely." *Id.* at 1577. In other words, ORS 161.295(2) excludes from the definition of mental disease or defect an abnormality evidenced *solely* by repeated criminal or otherwise antisocial conduct.

As discussed above, the DSM-III is the relevant edition of the DSM, which is incorporated into the PSRB's applicable rule. The DSM-III uses a multiaxial evaluation system, and each axis conveys a different class of information. DSM-III at 23. The first two of the five axes comprise the entire classification of mental disorders, as those disorders are addressed in the DSM-III. *Ibid.* Axis I consists of clinical syndromes and V Codes,[13] while Axis II consists of developmental disorders and personality disorders. *Ibid.* Neither the

---

[12] The following exchange occurred during petitioner's PSRB hearing:

"[PETITIONER'S ATTORNEY]: * * * I'm curious, Doctor, in your opinion is my client's pedophilia diagnosis one that's manifested by repeated criminal conduct?

"DR. MEYER: Well, *socially unacceptable behavior*, anyway." (Emphasis added.)

[13] A "V Code" is "a behavioral or psychological problem [that] may appropriately be a focus of professional attention or treatment even though it is not

statutes nor the rules refer specifically to Axis I or Axis II disorders.

The DSM-III establishes the following diagnostic criteria for pedophilia:

"A. The act or fantasy of engaging in sexual activity with prepubertal children is a repeatedly preferred or exclusive method of achieving sexual excitement.

"B. If the individual is an adult, the prepubertal children are at least ten years younger than the individual. If the individual is a late adolescent, no precise age difference is required, and clinical judgment must take into account the age difference as well as the sexual maturity of the child." DSM-III at 271-72.

Pedophilia is classified as a paraphilia, *id.* at 267, which is one of the types of psychosexual disorders on Axis I of the DSM-III, *id.* at 261. In the introduction to the section on "Psychosexual Disorders," the DSM-III states that paraphilias "are characterized by arousal in response to sexual objects or situations that are not part of normative arousal-activity patterns and that in varying degrees may interfere with the capacity for reciprocal affectionate sexual activity." *Ibid.*

Pedophiliac *activity* is both criminal[14] and antisocial.[15] However, pedophilia is *more than* just "criminal or otherwise antisocial conduct," because *it also has mental or psychological features.* As noted above, the DSM-III states that pedophilia is characterized by sexual arousal that is not a normal part of sexual activity. Indeed, under the DSM-III, the "essential feature" is "the act *or fantasy* of engaging in sexual activity with prepubertal children." *Id.* at 271 (emphasis added). Because the diagnosis of pedophilia under the DSM-III has mental or psychological features and is not limited to criminal or antisocial conduct, it is not an abnormality

---

attributable to a mental disorder." DSM-III at 6. For example, petitioner's borderline intellectual functioning is a V Code. *See id.* at 332 (listing V Codes).

[14] *See, e.g.*, ORS 163.375(1)(b) (sexual intercourse with a person who is under 12 years of age constitutes first-degree rape); ORS 163.427 (sexual contact with a person who is under 14 years of age constitutes first-degree sexual abuse).

[15] "Antisocial" means, as relevant:

"1a: tending to interrupt or destroy social intercourse[;] b: hostile to the well-being of society[;] c: characterized by markedly deviating behavior[.]" *Webster's* at 96.

manifested "only" by criminal or antisocial conduct. That being so, pedophilia is a mental disease or defect within the meaning of ORS 161.295(2) and OAR 859-10-005(4)(a) (1987), not excluded on the basis that it is "manifested only by repeated criminal or otherwise antisocial conduct."

## SUBSTANTIAL EVIDENCE

Petitioner's final argument is that there is not substantial evidence in the whole record to support the PSRB's finding that petitioner suffers from a mental disease or defect. "Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding." ORS 183.482(8)(c).

We already have concluded that pedophilia is a mental disease or defect. That leaves for determination the question whether the record supports a finding that petitioner suffers from pedophilia. The record consists of Meyer's and petitioner's testimony during petitioner's PSRB hearing, plus 48 exhibits, including case summaries, progress note updates made during petitioner's confinement at OSH, and other reports by OSH staff.

Expressly relying on Meyer's June 24, 1989, report in which he diagnosed petitioner as suffering from pedophilia under the DSM-III-R, the PSRB found that petitioner suffers from pedophilia. We have reviewed the record and conclude that, viewed as a whole, it would permit a reasonable person so to find. However, we have determined that the DSM-III is the applicable edition, incorporated into the rule. The diagnostic criteria for pedophilia in the DSM-III are similar to those in the DSM-III-R, but they are not identical. DSM-III at 271-72; DSM-III-R at 285. On this record, the differences might or might not matter. Therefore, we remand the case to the PSRB for reconsideration to determine whether petitioner meets the diagnostic criteria for pedophilia that are set forth in the DSM-III.

The decision of the Court of Appeals is reversed. The order of the Psychiatric Security Review Board is vacated, and the case is remanded to the Board for reconsideration.