Argued and submitted July 10, 2002, affirmed April 3, petition for review denied August 26, 2003 (335 Or 655)

In the Matter of Ronald Gibson,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

RONALD D. GIBSON,
*Appellant.*

M01-0035; A115473

66 P3d 560

Thomas A. Coleman argued the cause and filed the brief for appellant.

Jas. Jeffrey Adams, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Haselton, Presiding Judge, and Linder and Wollheim, Judges.

LINDER, J.

Wollheim, J., concurring.

## LINDER, J.

This is an appeal of an order adjudicating appellant to be a mentally ill person and committing him to the Mental Health Division. ORS 426.130(1)(b)(C). Appellant suffers from paraphilia, a condition that, in appellant's case, involves having and acting on fantasies of coercive and forcible sex with adult women. Appellant has a history of committing forcible sexual offenses against women he does not know. In a 1993 prosecution for two such offenses, appellant's insanity defense was rejected based on evidence that his paraphilia did not prevent him from conforming his conduct to the requirements of the law. Shortly before appellant's release from prison for those 1993 convictions, the state initiated this involuntary civil commitment proceeding. After an evidentiary hearing, the trial court determined that appellant's paraphilia is a mental disorder and that appellant is dangerous to others because of that condition. ORS 426.005(1)(d).[1] The trial court therefore ordered appellant's involuntary commitment. Appellant challenges the evidence as insufficient to support the order, arguing that his dangerousness to others is a product of his "autonomous choice," not of his paraphilia, and that he therefore is not a mentally ill person under ORS 426.005(1)(d). On *de novo* review, *State v. O'Neill*, 274 Or 59, 61, 545 P2d 100 (1976), we affirm.

Appellant, who is now 45 years old, was first convicted of a sexual offense in 1983 after he picked up a hitchhiker and forcibly raped her at knife point in his van. His next adjudicated offense occurred in 1991. Appellant approached a woman in a parking lot and, while wielding an open pocket knife, grabbed her arm and threatened to kill her if she did not get into his car. She resisted and got away. Appellant was apprehended, successfully prosecuted, sentenced to a period of incarceration, and later released on post-prison supervision. While on post-prison supervision, he committed the 1993 offenses. When interviewed by police about

---

[1] As pertinent here, ORS 426.005(1)(d) defines a "mentally ill person" as

"a person who, because of a mental disorder, is one or more of the following:

"(A) Dangerous to self or others.

"(B) Unable to provide for basic personal needs and is not receiving such care as is necessary for health or safety."

his commission of those offenses, appellant reported that he woke up that morning and immediately began thinking about raping women. He went to a shopping area and spotted a woman whom he wanted to rape but he made no attempt to do so because of the number of people in the area. He left that area and went to a department store. There, he got onto the elevator with a woman and, when the doors closed, he sexually assaulted her with the intent of raping her. She resisted and was able to get out of the elevator when the doors opened. Appellant left that store, crossed the street, and went into a jewelry store, where he went behind the counter and began to sexually assault a female employee. That victim also resisted, called for help, and appellant was apprehended. After arresting him, police found a "razor knife" in one of appellant's pockets. Appellant told the police

> "that he had purchased this knife about two weeks earlier for the purpose of displaying it to potential victims. He further indicated that he would kill a victim to complete a rape if the situation were right. [Appellant] told the police that he has had an overwhelming urge to rape since he was 19 years old * * * [and] that he had identified between 10 and 20 stores in Corvallis that had women employees whom he would rape if given the perfect opportunity."

Dr. Balsamo, a psychologist with experience in assessing sanity and evaluating sex offenders, was among the mental health experts who testified at the involuntary civil commitment hearing. Balsamo had evaluated appellant before his trial in 1993 to determine whether he was insane within the meaning of ORS 161.295.[2] That evaluation was based on clinical assessment and psychological testing of appellant, as well as Balsamo's review of police reports, another doctor's psychological evaluation of appellant, state

---

[2] ORS 161.295 provides:

"(1) A person is guilty except for insanity if, as a result of mental disease or defect at the time of engaging in criminal conduct, the person lacks substantial capacity either to appreciate the criminality of the conduct or to conform the conduct to the requirements of law.

"(2) As used in chapter 743, Oregon Laws 1971, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct, nor do they include any abnormality constituting solely a personality disorder."

hospital records, and county mental health records. Balsamo diagnosed appellant with paraphilia "not otherwise specified," meaning that his paraphilia was not pedophilia, exhibitionism, voyeurism, or some other specified type of paraphilia. Rather, appellant's paraphilia involved fantasizing and acting out coercive and forcible sex with adult women. Because Balsamo had not seen appellant since 1993, he did not offer a current diagnosis of appellant's condition. Balsamo did explain, however, that "paraphilias tend to linger, they tend not to go away on their own[.]" He further testified that, unlike some conditions that diminish over time, such as aggression and other antisocial behaviors, paraphilias can increase with age. In appellant's case, Balsamo thought that the length of time that appellant has suffered from paraphilia (as evidenced by appellant's professed overwhelming urge to rape beginning at age 19) created an especially high likelihood that his paraphilia remains active.

Balsamo's concern that appellant's paraphilia remains active was shared by the mental health experts who assessed appellant's condition contemporaneously with the involuntary commitment hearing. Among them was Dr. Maletzky, a psychiatrist. Shortly before appellant's release from prison, Maletzky evaluated appellant for suitability for Depo-Provera treatment, at the request of the Department of Corrections.[3] For that evaluation, Maletzky interviewed appellant and reviewed appellant's "offender chronologic history," which consisted of his contacts with corrections officers while incarcerated, as well as all police and presentence reports pertaining to appellant's 1993 crimes. Maletzky diagnosed appellant as having "multiple paraphilias." In particular, he concluded that appellant "had some measure of sadism," as well as a history of voyeurism and frotteurism,[4] and "so I felt that there were multiple things going on with deviant sexual urges and that he was likely to act out on those." When asked whether paraphilias go away on their own without treatment, Maletzky explained that

---

[3] According to Maletzky, Depo-Provera is a "medicine to lower sexual drive." In addition to reducing sexual drive, it reduces aggression generally.

[4] Maletzky defined frotteurism as "a condition where a man rubs up against a woman in crowded situations."

"paraphilias persist in most men without treatment" and that he thought appellant's paraphilias were "still quite active."[5]

The other mental health professionals who evaluated appellant's current condition similarly diagnosed appellant as suffering from paraphilia. Dr. Boziezich, a psychiatrist who examined appellant at the time of the involuntary commitment proceeding, concluded that appellant's paraphilia involved "compulsions to engage in sadistic and violent behavior towards particularly women." Both of the county mental health investigators who examined appellant, Neve and Rethlefsen, agreed that appellant suffers from paraphilia; Neve more specifically described appellant's paraphilias as including frotteurism and sexual sadism.

The mental health professionals disagreed, however, as to whether paraphilias properly should be classified as mental disorders. Paraphilias are "Axis I" diagnoses in the American Psychiatric Association's current *Diagnostic and Statistical Manual of Mental Disorders* (4th ed 1994) (DSM-IV). According to Maletzky, one of the psychiatrists, Axis I diagnoses are considered mental disorders, and his opinion was that paraphilias properly should be classified as mental disorders.[6] Neve, one of the community mental health investigators who examined appellant, agreed. But Boziezich (the other psychiatrist) and Rethlefsen (the other community mental health examiner) viewed paraphilias to be behavioral disorders and therefore did not classify them as mental disorders. Boziezich explained that, in her opinion, mental disorders are limited to "disorders that can lead to psychosis," such as "schizophrenia, major depression with psychosis or manic depression with psychosis" and similar conditions that satisfy the criteria of "mental illness."[7]

---

[5] Contrary to Balsamo's testimony, Maletzky testified that there can be a "slight decline" in paraphilias with age for some individuals. He also observed, however, that paraphilias can persist past age 80.

[6] According to the DSM-IV, Axis I disorders are classified as "clinical disorders"; Axis II disorders are classified as "personality disorders." DSM-IV at 25.

[7] Balsamo was not asked whether, in his professional judgment, paraphilias qualify as mental disorders.

The experts were in general agreement that appellant's paraphilia creates compulsions for him to act out his sexual fantasies but that there also is an element of volition in his behavior. For example, in evaluating appellant to assess his criminal responsibility in connection with the 1993 criminal charges, Balsamo concluded that appellant had control over his conduct, as demonstrated by the way that he searched for his victims and picked the places where he attacked them. For that reason, Balsamo's opinion at that time was that appellant was not insane at the time of his crimes because he was able to conform his conduct to the law. At the time of the civil commitment proceeding, however, Balsamo did believe that appellant's paraphilia impaired his ability to control his impulses:

> "Yes, I certainly think there's some impulse control [problem], I think his paraphilia is a compulsive type of thing which means that these are urges that have been chronic, these are urges that are strong, these are urges that cause him anxiety and discomfort unless he acts out on them. And I think it's also associated with lack of controlling those urges which would certainly be considered impulsive."

Balsamo did not diagnose a specific impulse control disorder in his 1993 evaluation. But appellant's history of moving directly from fantasies into actions signified to Balsamo that appellant lacked good impulse control and solid judgment. Balsamo believed that appellant committed his 1993 offenses as a result of his paraphilia and not out of a desire to commit a crime.

Boziezich's and Maletzky's testimony was similar. Consistently with Balsamo's diagnosis of appellant in 1993, Boziezich concluded that appellant "[u]ltimately * * * does have a choice about what he does."[8] But she also believed that he suffers from "a lot of compulsions" to engage in sadistic and violent behavior toward women. Maletzky described appellant as having an impulse control problem and identified lack of impulse control as a characteristic of paraphilias.

---

[8] Rethlefsen also testified that appellant had the ability to control his actions sufficiently to say that he could conform his conduct to the requirements of the law. Rethlefsen was not asked about and did not comment on whether appellant also suffered from significant impulse control impairment, however.

Maletzky also observed that impulse control problems can be caused by conditions such as central nervous system damage or other developmental disability. He suspected that appellant "might" have some borderline developmental disability, which added to Maletzky's concern that appellant had impulse control problems. Maletzky could not say with a "high likelihood," however, that such damage existed and contributed to appellant's impaired sexual impulse control.

All of the witnesses agreed that appellant would be dangerous if he were at liberty in the community due to the likelihood that he would commit future criminal acts against women. Maletzky, in assessing whether appellant was an appropriate candidate for Depo-Provera treatment, used a widely accepted predictive test scale (called "Static 99") to determine appellant's dangerousness and potential for "repeat criminal activity." Maletzky also considered that, in his interview with appellant, appellant both minimized and denied his past criminal conduct and did not believe that he needed treatment as a sex offender. Maletzky concluded that appellant's potential for reoffending placed him in the exceptionally small proportion (*i.e.*, one or two percent) of sex offenders who qualify as candidates for Depo-Provera because they are "the most dangerous of men that we think are going to go right out and offend even when they're still in the treatment program." In Maletzky's opinion, appellant's mental disorder (*i.e.*, his multiple paraphilias) causes him to be dangerous to others.

Boziezich concurred that it was "extremely likely" that appellant will reoffend, that he was a "quite high risk" in terms of potential dangerousness to women, and that he was a "very dangerous person." She did not attribute appellant's dangerousness to a mental disorder, however, because she did not consider paraphilias to be mental disorders. Simpson, the parole and probation officer who supervised appellant Gibson during his probation in the 1980s and his post-prison supervision in 1992, also testified that, based on appellant's history and lack of interest in receiving sex offender treatment, appellant was dangerous and "extremely likely" to reoffend.

In assessing appellant's dangerousness, the witnesses equivocated only in quantifying appellant's risk of reoffending and in predicting when he would reoffend. Maletzky, for example, did not predict exactly when appellant might commit another sexual offense. Nor could he quantify what he characterized as appellant's "high risk" of committing sexual offenses against women if he were at large in the community. When pressed to quantify the risk, he described it in statistical terms as between 51 and 60 percent, which he agreed equated with likelihood and not a high probability. Rethlefsen believed that appellant would be dangerous in the future in that appellant was "likely to do something to sexually assault a woman in some way." Rethlefsen could not predict that appellant would offend immediately if released—*i.e.*, on the date of the hearing.[9] But he believed in effect that the longer appellant went without reoffending, the more likely appellant was to reoffend. Beyond that, Rethlefsen could not say if appellant would reoffend in six months, six years, or 50 years.

In response to the evidence presented at the commitment hearing, appellant argued that the evidence did not provide clear and convincing proof to support his involuntary commitment. He argued that, "first and foremost," the evidence of his dangerousness to others was insufficient because the witnesses testified only that appellant was at "high risk" to reoffend and were unable to quantify that risk or describe that risk as an immediate one. Appellant argued, second, that his paraphilia did not qualify as a mental disorder because he "can conform his conduct to that [pre]scribed by the law." As a result, according to appellant, he was "much like any other parolee" who may reoffend as a result of "behavioral decisions" he might make, not as a result of his mental disorder.

---

[9] Neve likewise could not predict that appellant was "imminent[ly]" dangerous, because she could not say that he would reoffend "today." She believed that the standards for involuntary commitment required that kind of imminency. Although Neve therefore declined in her report to classify appellant as dangerous to others, she nevertheless commented that appellant's "repetitive sexual assaults in the community lead me to believe that he could be dangerous in the future[.]" At the commitment hearing, she testified that there is "a fairly good likelihood that [appellant] may re-offend in the future. * * * I just can't say that it's *now*." (Emphasis added.)

The trial court prepared a letter opinion setting out its factual findings and explaining its rationale for ordering appellant's commitment. In that opinion, the trial court acknowledged the split of professional views as to whether appellant's paraphilia qualifies as a mental disorder. Relying on the expert testimony that paraphilias are mental disorders and the Oregon Supreme Court's decision in *Osborn v. PSRB*, 325 Or 135, 147-50, 934 P2d 391 (1997) (pedophilia, a type of paraphilia, falls within the definition of "mental disease or defect" in ORS 161.295), the trial court determined that appellant's paraphilia qualifies as a mental disorder for purposes of involuntary civil commitment.

On the issue of appellant's dangerousness to others, the trial court found:

> "Based on the evidence presented, primarily the testimony of Dr. Balsamo and Dr. Maletzky that [appellant's] paraphilia does not improve over time, the nature of his paraphilia and the compulsive nature of the conduct caused by his paraphilia, the court concludes that [appellant] is a danger to others and that this status has been established by clear and convincing evidence. In addition, the court has considered that Dr. Maletzky has prescribed Depo Provera, which is given only to the most dangerous of men.

> "* * * * *

> "The evidence need not show that danger to others is immediate, but clear and convincing evidence must show that harm to others exists in the near future. Dr. Balsamo and Dr. Maletzky opined that, without treatment, [appellant] is a significant danger to others, but neither could predict when he would reoffend. Carolyn Neve testified that [appellant] is a risk, although she couldn't say that the risk to others existed at that time. [Appellant] has been convicted of kidnaping and rape, the very behavior characterizing his paraphilia. Based on this evidence, the court finds that the danger to others [presented] by [appellant] is immediate in the sense that it could occur at any time. While the evidence does not indicate when [appellant] would endanger others, it shows a high probability that this would occur in the near future."

On appeal, appellant argues that the record does not support his commitment. In doing so, he abandons some of

the arguments he made below, and renews only his contention that the evidence is insufficient because it establishes that his sexual acts have been in the past and will be, if they occur in the future, a product of "autonomous choice" and not of a mental disorder.[10] In that regard, appellant concedes that he "may have a mental disorder" and does not argue that the evidence compels a contrary conclusion or even that we should conclude otherwise on *de novo* review. Rather, appellant's focus is on the fact that he was adjudicated to be criminally responsible for his past sexual offenses, that there has been no significant change in his condition, and that any future sexual offenses he may commit would be, in his view, a result of his volitional choice to ignore the law, rather than an inability to control his actions caused by his mental disorder.

■　　In that regard, appellant is correct that there must be a causal nexus between his mental disorder and his dangerousness to others. Under our statutory scheme, a person may be involuntarily civilly committed if he or she is shown, by clear and convincing evidence, to be a mentally ill person. ORS 426.130. A "mentally ill person" is someone who, "because of" a mental disorder, is dangerous to self or others or unable to meet his or her basic needs. ORS 426.005(1)(d).

---

[10] In arguing that he has the ability to make autonomous choices, appellant's brief contains two sentences noting parenthetically that the evidence does not support a conclusion that his commission of criminal acts in the future was highly probable and observing that no witness would predict when such criminal acts might occur. If appellant means to challenge the evidence pertaining to his dangerousness on appeal, he has not adequately presented the argument. Those two sentences are injected into an unrelated contention without any development of the argument or legal analysis that might support them.

Even if a challenge to the evidence on dangerousness is properly presented on appeal, however, we reject it on *de novo* review for the same reasons that the trial court rejected it. The evidence that appellant is highly likely to commit forcible sexual offenses against women in the future is plentiful and convincing. In the context of a dangerousness-to-others determination, we have never held the witnesses or the factfinder to the impossible task of predicting *when* violent future acts would occur. Rather, evidence of past acts can support a finding of dangerousness to others if it "forms the foundation for a prediction of future dangerousness[.]" *State v. Lucas*, 31 Or App 947, 950, 571 P2d 1275 (1977). As a result, "[w]e have found generally that where a mentally ill person has threatened and has committed overt violent acts against others in the past, the clear and convincing evidence standard is met." *State v. King*, 177 Or App 373, 377, 34 P3d 739 (2001); *see also State v. Allmendinger*, 36 Or App 381, 384, 584 P2d 773 (1978) (evidence of dangerousness to others held sufficient where "threats are accompanied by violent acts, and there is no indication that such violence is an isolated occurrence"). This is such a case.

Thus, a person cannot be involuntarily committed under the statute merely on satisfactory evidence that the person has a mental disorder. Nor is it enough to prove that the person has a mental disorder *and* is dangerous or unable to meet his or her basic needs. Rather, the statute "expressly requires that there be *a causal connection* between the alleged mental disorder and the danger to self [or others] or inability to meet basic needs." *State v. Gjerde*, 147 Or App 187, 192, 935 P2d 1224 (1997) (emphasis added).

■■ Appellant also is correct that conduct that is purely volitional—that is, conduct that is engaged in as a result of a person's "free, knowing, and rational choice"—does not satisfy the requirement of a causal connection between dangerous behavior and the person's mental illness. *Id.* at 196. On the other hand, consistently with the "properly limited function of involuntary civil commitment," if clear and convincing evidence establishes that a mental disorder has "materially impaired" a person's ability to make autonomous choices, the requisite causal nexus is satisfied. *State v. Linde*, 179 Or App 553, 559, 561, 41 P3d 440 (2002). Thus, appellant is not correct in his implicit assertion that there can be no element of volition involved. The statute's causal nexus requirement is satisfied if the allegedly mentally ill person's volition is significantly impaired by the person's mental disorder. In *State v. Hegbloom*, 179 Or App 86, 38 P3d 963 (2002), for example, the allegedly mentally ill person suffered from paranoid delusions that created impulses in him to harm others. In the past, he had been able to resist those impulses and had never acted on them. But the testimony established that it was very difficult for him to resist those impulses and that his mental disorder therefore made it very likely that he would harm other people. Because his mental disorder impaired his impulse control and his judgment, we concluded that his condition made him dangerous to others and we affirmed the order of commitment. *Id.* at 89-91.

■■ Our approach to the statute's causal nexus requirement in that regard comports with federal constitutional principles.[11] Consistently with the federal Due Process

---

[11] Appellant does not assert that the evidence is constitutionally insufficient; he relies only on ORS 426.005(1)(d). Nevertheless, because constitutional

Clause,[12] a state may not civilly commit a person "without *any* lack-of-control" determination. *Kansas v. Crane*, 534 US 407, 412, 122 S Ct 867, 151 L Ed 2d 856 (2002) (emphasis in original). To do so would permit civil commitment to be a " 'mechanism for retribution or general deterrence'—functions properly those of criminal law, not civil commitment." *Id.* (quoting *Kansas v. Hendricks*, 521 US 346, 372-73, 117 S Ct 2072, 138 L Ed 2d 501 (1997) (Kennedy, J., concurring)). But ensuring that the function of civil commitment is properly limited does not require a demonstration that a dangerous individual is completely unable to control his or her behavior. *Id.* at 413. Rather, it is enough that there is proof of "serious difficulty in controlling behavior," together with a severe mental abnormality "sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case." *Id.* In other words, the constitution permits an overlap between those persons whom a state may subject to criminal liability for their past acts and those whom a state may civilly commit on the basis of future dangerousness.[13] But the overlap is a narrow one.

The sufficiency of the evidence to support appellant's commitment in this case therefore does not turn on the existence of evidence that he committed sexual acts in the past and did so with sufficient volition to be criminally responsible for his conduct. Contrary to appellant's argument, the fact that he was found criminally responsible for his past sexual offenses or that he can exercise "autonomous choice" in the future does not preclude his civil commitment, either legally or factually. The important question is whether appellant's

principles inform the rigor with which we should apply our statutory causation requirement, we discuss the federal due process standard.

[12] US Const, Amend XIV.

[13] As the Court declared in *Crane*, an "absolutist approach" permitting civil commitment only on a showing of a complete lack of volition or control would be "unworkable." 534 US at 411. Quoting publications from the mental health field, the Court parenthetically noted that " '[t]he line between an irresistible impulse and an impulse not resisted is probably no sharper than that between twilight and dusk' " and observed that "most severely ill people—even those commonly termed 'psychopaths'—retain some ability to control their behavior." *Id.* at 412 (citing and quoting sources).

mental disorder—*i.e.*, paraphilia—is characterized by sufficiently impaired impulse control to distinguish him from the "dangerous but typical recidivist" sex offender.

The evidence in this record satisfies us, by a clear and convincing standard of proof, that appellant's impulse control is so impaired. As earlier recounted, Balsamo, the psychologist who evaluated appellant in 1993, concluded that appellant suffered from an impulse control problem. He described appellant's paraphilia as "a compulsive type of thing" involving chronic and strong urges that caused appellant "anxiety and discomfort" if he did not act on them. The way in which appellant moved directly "from fantasies into actions" also caused Balsamo to believe that appellant lacked good impulse control. Boziezich similarly observed that appellant's paraphilia caused him to suffer from "a lot of compulsions" to engage in sadistic and violent behavior towards women. Maletzky, as did Balsamo, expressly stated that appellant had an impulse control problem; and, although Maletzky did not diagnose a specific cause of that lack of impulse control, his testimony established that impulse control can be an aspect of paraphilia itself or could be caused or aggravated by other conditions from which appellant may suffer (such as central nervous system damage). Significantly, no witness testified that appellant's impulse control was not materially impaired or that his actions were completely volitional.

Those observations by the mental health professionals are reinforced by appellant's history. By his own account, appellant has had "overwhelming urges" to rape women since he was 19 years old. When he committed his 1993 sexual offenses, he woke that morning, immediately began obsessing about raping women, and moved directly from his fantasies into action in the way that concerned Balsamo. Appellant told Balsamo that, after he sexually assaulted the victim in the elevator, he had "thoughts of remorse thinking that he had been trying so hard to stay out of trouble and here he was getting into more trouble." Despite that conscious thought on his part, appellant moved immediately into a second sexual assault against the employee in the jewelry store.

Finally, as did the trial court, we also give particular weight to Maletzky's testimony regarding appellant's appropriateness for Depo-Provera treatment. Maletzky explained that Depo-Provera is "not used for many sexual offenders, just a few"—in his experience, only about one or two percent of sex offenders are candidates for the treatment. Maletzky's assessment that appellant qualifies to be in that small percentage of offenders strongly reinforces the conclusion that appellant is not a typical criminal recidivist for whom the civil commitment process is being used in place of criminal sanctions. He is, instead, someone with a severe mental disorder that causes him serious difficulty in controlling his behavior. The nature of his mental disorder in combination with his impaired ability to control his impulses causes him to fall within the narrow overlap between the criminal law and civil commitment systems. The evidence satisfies the standards for his involuntary civil commitment.

Affirmed.

**WOLLHEIM, J.,** concurring.

I concur because I agree with the majority that appellant suffers from a mental disorder and is dangerous to others. In fact, appellant is extremely dangerous to women. As explained below, I write separately due to my concern regarding the use of the civil commitment statutes for purposes of preventive detention. However, before I discuss my concern, I want to emphasize that the majority's holding is not a license to throw people back in confinement on the day of their release from prison.

Appellant's challenge to his civil commitment is that the state did not sufficiently prove the nexus between his paraphilia and his dangerousness to the public and that there was insufficient evidence to demonstrate he lacked volitional control. Appellant has had overwhelming urges to rape women since he was 19 years old. He has been incarcerated twice for sexually assaulting women. Regarding the last incident, appellant woke up in the morning with an urge to rape somebody and proceeded to act on that urge. At the civil commitment hearing, the experts agreed that appellant suffers from paraphilia and that it is only a matter of time before he

again acts out on his sexually violent impulses. Thus, there was sufficient evidence of the nexus between appellant's dangerousness and his mental disorder and sufficient evidence that appellant had serious difficulty controlling his behavior. The only disagreements among the experts were whether appellant's paraphilia was classified as a mental disorder or a personality disorder and when exactly appellant would next sexually assault someone. Appellant has not challenged his commitment on either of those grounds on appeal.

Appellant falls within a narrow overlap of criminal and civil law where persons may be subject both to criminal liability and civil commitment. In *Kansas v. Crane*, 534 US 407, 122 S Ct 867, 151 L Ed 2d 856 (2002), and *Kansas v. Hendricks*, 521 US 346, 117 S Ct 2072, 138 L Ed 2d 501 (1997), the United States Supreme Court limited when sexually dangerous offenders may be civilly committed and underscored the constitutional importance of distinguishing dangerous sexual offenders subject to civil commitment from other dangerous but typical recidivists who are more properly dealt with through criminal proceedings. To be constitutionally permissible, the civil commitment must take place pursuant to proper procedures and evidentiary standards and there must be a finding of dangerousness to self or others coupled with a serious mental disorder. *Crane*, 534 US at 409-10. Further, "there must be proof of serious difficulty in controlling behavior." *Id.* at 413.

Those requirements have been satisfied in this case. Because those requirements were satisfied this case is not a case of preventive detention. Appellant is not "confined in any prison, jail or other enclosure where those charged with a crime * * * are incarcerated." ORS 426.140(1). Rather, appellant is committed to the custody of the Department of Human Services, which will assign him to a treatment facility. ORS 426.140(2).

In a recent movie, *Minority Report,* Washington, D.C., residents could be convicted for *precrimes* they were about to commit. Convicting a person for a crime before the crime is committed is preventive detention. In the former Union of Soviet Socialist Republics, it was reported that dissidents were hospitalized in mental institutions because

their incorrect political beliefs meant that they had a mental disorder. Imprisoning political dissidents for their political beliefs is preventive detention.

As a society that values freedom, we must avoid preventive detention and avoid imprisoning individuals for their beliefs. However, in this case, appellant is not being preventively detained or imprisoned for his beliefs. Rather, he is committed because he meets the statutory requirements for mental commitment.